# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 24-60452

PHI THETA KAPPA HONOR SOCIETY,

*Plaintiff-Appellee,*

LYNN TINCHER-LADNER,

*Defendant / Third-Party Defendant-Appellee,*

v.

HONORSOCIETY.ORG., INCORPORATED; HONOR SOCIETY
FOUNDATION, INCORPORATED,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI,
NORTHERN DIVISION IN CASE NO. 3:22-CV-208,
HONORABLE CARLTON W. REEVES, U.S. DISTRICT JUDGE

## BRIEF FOR DEFENDANTS-APPELLANTS

DEREK A. NEWMAN
DEREK LINKE
JASON B. SYKES
NEWMAN LLP
*Attorneys for Defendants-Appellants*
100 Wilshire Boulevard, Suite 700
Santa Monica, California 90401
(310) 359-8200

## Certificate of Interested Persons

No. 24-60452

## *Phi Theta Kappa Honor Society v. HonorSociety.org Inc., et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Defendants-Appellants:**

HonorSociety.org Inc.

Honor Society Foundation, Inc.

Michael Moradian

**Counsel for Appellants:**

NEWMAN LLP
Derek A. Newman
Derek Linke
Gregory M. Scialabba
Keith P. Scully
Jason Sykes

JONES WALKER LLP
W. Whitaker Rayner
Dakota J. Stephens
Hugh A. Warren, V
Kristine Callahan

**Plaintiff-Appellee:**

Phi Theta Kappa Honor Society

**Third-Party Defendant-Appellee:**

Lynn Tincher-Ladner

**Counsel for Appellees:**

WISE CARTER CHILD & CARAWAY, P.A.
Michael B. Wallace
Beau M. Bettiga
Charles E. Cowan
Jack F. Hall

TAFT STETTINIUS & HOLLISTER LLP
Jonathan G. Polak
Rachel A. Smoot
William M. Etienne
Daniel R. Warncke

<u>/s/ Derek A. Newman</u>
Derek A. Newman
Derek Linke
Jason B. Sykes
100 Wilshire Blvd, Suite 700
Santa Monica, CA 90401
(310) 359-8200
dn@newmanlaw.com
linke@newmanlaw.com
jason@newmanlaw.com

## Statement Regarding Oral Argument

This case involves a matter of first impression about application of the First Amendment to state-law torts alleging disparagement, but not defamation. This case also concerns several other First Amendment and Fourteenth Amendment issues. Finally, appellant HonorSociety seeks a reversal of the trial court based on errors in applying the law of tortious interference with contractual relations under Mississippi law. HonorSociety respectfully suggests that the Court could benefit from a discussion with counsel about these important and novel federal constitutional issues, and the legal issues relating to the state claim.

/s/ Derek A. Newman
Derek A. Newman
Derek Linke
Jason B. Sykes
100 Wilshire Blvd, Suite 700
Santa Monica, CA 90401
(310) 359-8200
dn@newmanlaw.com
linke@newmanlaw.com
jason@newmanlaw.com

# TABLE OF CONTENTS

Jurisdictional Statement...........................................................................1

Issues Presented....................................................................................1

Statement of the Case...........................................................................3

Summary of the Argument ...................................................................15

Standard of Review ..............................................................................19

Argument...............................................................................................20

I.   The district court misapplied the law on likelihood of success and irreparable harm, and made erroneous factual findings on the other preliminary-injunction elements. ............................20

    A.   The district court committed legal error in finding a likelihood of success on the merits because it didn't find that a third party breached a contract, and mistook correlation for causation. .......................................................21

    B.   The district court erred in finding PTK likely to prove its tortious-interference claim without requiring it to meet "the same First Amendment requirements that govern actions for defamation.".............................27

    C.   The district court erred in applying the remaining preliminary-injunction factors.................................32

II.   The injunction violates the Constitution because it is an overbroad and vague prior restraint. ...........................35

    A.   The court's ban on truthful edits to Wikipedia violates the First Amendment because it restrains noncommercial speech without justification, and is overbroad even if the speech is commercial. ..........37

B.    Outlawing the "despicable" image is unconstitutional because the First Amendment protects offensive images and parodies. ................................................................ 41

C.    Censoring discussion about the PTK chapter-advisor arrest is vague as to what is "false" and overbroad because it applies to true statements. .................................. 43

D.    The ban on reports about sexual-harassment allegations against Risley is viewpoint discrimination, and overbroad because it forbids true statements. ....................... 49

III.  The injunction compels speech, which violates the First Amendment. ............................................................................ 51

A.    The order unconstitutionally compels HonorSociety to publish PTK's contact information on HonorSociety's website. .................................................................. 52

B.    Requiring HonorSociety to publish a false "disclaimer" unconstitutionally compels HonorSociety to speak the court's untruthful message. .................................. 53

Conclusion ............................................................................. 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ............................................................. 51

*Affiliated Prof'l Home Health Care Agency v. Shalala,*
164 F.3d 282 (5th Cir. 1999) ............................................... 20

*Am. Auto. Ins. Co. v. First Mercury Ins. Co.,*
No. 13-439 KG/LF, 2018 U.S. Dist. LEXIS 65980
(D.N.M. April 19, 2018) ...................................................... 56

*Bailey v. Iles,*
87 F.4th 275 (5th Cir. 2023) ........................................... 42-43

*Bandy v. DeLay (In re DeLay),*
No. 14-71512, 2018 Bankr. LEXIS 934 (C.D. Ill. Mar. 29, 2018) ....... 56

*Basinkeeper v. United States Army Corps of Eng'rs,*
894 F.3d 692 (5th Cir. 2018) ............................................... 37

*Beverly Hills Foodland v.*
*United Food & Com. Workers Union, Local 655,*
39 F.3d 191 (8th Cir. 1994) ................................................. 29

*Bolger v. Youngs Drugs Prods. Corp.,*
463 U.S. 60 (1983) .......................................... 44, 45, 46, 47

*Bose Corp. v. Consumers Union of U.S., Inc.,*
466 U.S. 485 (1984) ............................................................ 37

*CAE Integrated, LLC v. Moov Techs., Inc.,*
44 F.4th 257 (5th Cir. 2022) ............................................... 20

*Carolina Cas. Ins. Co. v. Sharp,*
No. 1:10CV02492, 2011 U.S. Dist. LEXIS 113184
(N.D. Ohio Sep. 30, 2011) ................................................... 56

*CBS v. Davis,*
510 U.S. 1315 (1994) .......................................................... 36

*Cenac v. Murry*,
  609 So. 2d 1257 (Miss. 1992) ............................................ 22, 24, 27, 32

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980) ....................................................... 50, 51

*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir. 2006) ............................................. 34

*Davis v. E. Baton Rouge Par. Sch. Bd.*,
  78 F.3d 920 (5th Cir. 1996) .............................................. 36

*Deerfield Med. Ctr. v. Deerfield Beach*,
  661 F.2d 328 (5th Cir. 1981) ............................................. 33

*Durham v. Ankura Consulting Grp., LLC*,
  No. 2:20-CV-112-KS-MTP, 2021 U.S. Dist. LEXIS 4639
  (S.D. Miss. Jan. 11, 2021) ................................................ 23

*Elrod v. Burns*,
  427 U.S. 347 (1976) ...................................................... 33

*Express Oil Change, L.L.C. v.
Miss. Bd. of Licensure for Prof'l Eng'rs & Surveyors*,
  916 F.3d 483 (5th Cir. 2019) ............................................. 50

*Farah v. Esquire Magazine*,
  736 F.3d 528 (D.C. Cir. 2013) ........................................... 29

*Franklin v. Thompson*,
  722 So. 2d 688 (Miss. 1998) ............................................. 31

*Harris v. Quinn*,
  573 U.S. 616 (2014) .................................................... 38, 50

*Hollywood Cemetery Ass'n v. Bd. of Mayor & Selectmen*,
  760 So. 2d 715 (Miss. 2000) ............................................. 24

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) .................................................... 51, 54

*Huss v. Gayden*,
  571 F.3d 442 (5th Cir. 2009) ............................................. 25

*Hustler Magazine v. Falwell,*
  485 U.S. 46 (1988)............................................................28, 43

*Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.,*
  88 F.3d 274 (5th Cir. 1996)..................................................34

*Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs.,*
  175 F.3d 848 (10th Cir. 1999)............................................29

*Kargar v. Defendants,*
  No. 22-C V-664 (JMF), 2022 U.S. Dist. LEXIS 229863
  (S.D.N.Y. Dec. 21, 2022) ...................................................56

*Lehman v. Holleman,*
  526 F. App'x 346 (5th Cir. 2013)........................................57

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014)......................................................26, 45

*Louisiana v. Biden,*
  45 F.4th 841 (5th Cir. 2022) ..............................................43

*Marceaux v. Lafayette City-Parish Consol. Gov't,*
  731 F.3d 488 (5th Cir. 2013)................................37, 40, 50

*Matal v. Tam,*
  582 U.S. 218 (2017)......................................................41, 42

*Mock v. Garland,*
  75 F.4th 563 (5th Cir. 2023) ..............................................27

*Munoz v. Orr,*
  200 F.3d 291 (5th Cir. 2000)..............................................25

*N.Y. Times Co. v. Sullivan,*
  376 U.S. 254 (1964).............................................................28

*National Institute of Family & Life Advocates v. Becerra,*
  585 U.S. 755 (2018)..............................................................55

*Neb. Press Ass'n v. Stuart,*
  427 U.S. 539 (1976).........................................................35-36

*Next Techs., Inc. v. Beyond the Office Door LLC,*
No. 19-cv-217-wmc, 2020 U.S. Dist. LEXIS 102413
(W.D. Wis. June 10, 2020) ........................................................ 29, 30

*Opulent Life Church v. City of Holly Springs,*
697 F.3d 279 (5th Cir. 2012) ................................................................ 34

*P&G v. Amway Corp,*
242 F.3d 539 (5th Cir. 2001) .............................................. 44, 45, 46, 48

*Par Indus. v. Target Container Co.,*
708 So. 2d 44 (Miss. 1998) ................................................ 21, 24, 32-33

*Perez v. City of San Antonio,*
98 F.4th 586 (5th Cir. 2024.) ............................................................... 54

*Phi Theta Kappa Honor Soc'y v. HonorSociety.Org, Inc.,*
No. 3:22-CV-208-CWR-RPM, 2024 U.S. Dist. LEXIS 57613
(S.D. Miss. Mar. 29, 2024) ............................................................... 3, 5

*Pie Dev., LLC v. Pie Ins. Hldgs., Inc.,*
No. 3:19CV792-HTW-LGI, 2021 U.S. Dist. LEXIS 143323,
2021 WL 3206043 (S.D. Miss. July 21, 2021)..................................... 23

*Pittsburgh Press Co. v. Pittsburgh Com. on Human Relations,*
413 U.S. 376 (1973).............................................................................. 38

*Planned Parenthood of Greater Tex. Family Planning & Preventative
Health Servs. v. Kauffman,*
981 F.3d 347 (5th Cir. 2020)............................................ 37, 38, 50, 52

*Police Dept. of Chicago v. Mosley,*
408 U.S. 92 (1972).............................................................................. 49

*Pub. Citizen, Inc. v. La. Atty. Disciplinary Bd.,*
632 F.3d 212 (5th Cir. 2011) ............................................................... 51

*R J Reynolds Tobacco Co. v. FDA,*
96 F.4th 863 (5th Cir. 2024) .................................................. 52, 54, 55

*R. A. V. v. St. Paul,*
505 U.S. 377 (1992).............................................................................. 49

*Rest. Law Ctr. v. United States DOL,*
66 F.4th 593 (5th Cir. 2023) .................................................. 21, 28, 32

*Riley v. Nat'l Fed. of Blind, Inc.*,
    487 U.S. 781 (1988) ............................................................... 54

*Roman Catholic Diocese v. Cuomo*,
    592 U.S. 14 (2020) ................................................................. 33

*Ronaldo Designer Jewelry, Inc. v. Cox*,
    No. 1:17-CV-2-DMB-DAS, 2019 U.S. Dist. LEXIS 43785
    (N.D. Miss. Mar. 18, 2019) .................................................... 23

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ........................................................ 49, 53

*RPM Pizza, LLC v. Risk & Ins. Consultans, Inc.*,
    No. 1:21-cv-158-LG-RHWR, 2021 U.S. Dist. LEXIS 215324
    (S.D. Miss. Nov. 8, 2021) ...................................................... 23

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ............................................................... 30

*Street v. New York*,
    394 U.S. 576 (1969) ............................................................... 42

*Tobinick v. Novella*,
    848 F.3d 935 (11th Cir. 2017) ......................................... 47, 48

*Tory v. Cochran*,
    544 U.S. 734 (2005) ............................................................... 40

*Unelko Corp. v. Rooney*,
    912 F.2d 1049 (9th Cir. 1990) ............................................... 29

*United States v. Abbott*,
    110 F.4th 700 (5th Cir. 2024) ............................................... 32

*United States v. Brown*,
    218 F.3d 415 (5th Cir. 2000) ................................................. 36

*United States v. Valencia*,
    600 F.3d 389 (5th Cir. 2010) ................................................. 25

*Wexler v. Dorsey & Whitney, LLP*,
    No. 18-CV-3066-SJB, 2019 U.S. Dist. LEXIS 186648
    (E.D.N.Y. Oct. 25, 2019) ...................................................... 48

*Zauderer v. Office of Disciplinary Counsel of Supreme Court,*
    471 U.S. 626 (1985) ..................................................................... *passim*

## Statutes & Other Authorities:

U.S. Const., amend. I ................................................. *passim*

15 U.S.C. § 2 ...........................................................................1

15 U.S.C. § 1051 ......................................................................1

15 U.S.C. § 1052(a) ............................................................41-42

28 U.S.C. § 1292(a)(1) .............................................................1

28 U.S.C. § 1331 ......................................................................1

28 U.S.C. § 1332 ......................................................................1

28 U.S.C. § 1337 ......................................................................1

28 U.S.C. § 1338(a) ..................................................................1

28 U.S.C. § 1338(b) ..................................................................1

28 U.S.C. § 1367(a) ..................................................................1

## JURISDICTIONAL STATEMENT

The district court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1338(a) and (b) because this action arises under the laws of the United States, including the Sherman Antitrust Act (15 U.S.C. § 2) and Lanham Act (15 U.S.C. § 1051, et seq.). ROA.2759-2804. The district court has supplemental jurisdiction over the related state claims under 28 U.S.C. § 1367(a) because they are factually interdependent with the federal claims and arise from the same case or controversy. ROA.2759-2804. The district court also has jurisdiction under 28 U.S.C. § 1332 because defendants/counter-plaintiffs HonorSociety.org Inc. and Honor Society Foundation, Inc. are citizens of a different state than plaintiff/counter-defendant Phi Theta Kappa Honor Society and third-party defendant Lynn Tincher-Ladner, and the amount in controversy exceeds $75,000.

On August 22, 2024, the district court issued the order presented for this Court's review. ROA.8150-8176. On August 27, 2024, appellant HonorSociety timely appealed. ROA.8345. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal of an interlocutory order of the district court granting an injunction.

## ISSUES PRESENTED

1. **Misapplied Law on Tortious-Interference Claim.** Tortious interference with contractual relations occurs when the defendant

1

causes a third party to breach its contract with the plaintiff. When based on disparaging speech, the plaintiff must also prove the elements of defamation. Here, the district court found appellee PTK was likely to prevail on that claim without identifying a specific breached contract, and mistook correlation for causation. It also did not find the elements of defamation. Did the court err?

**2. Unconstitutional Overbroad Prior Restraint of Speech.**
An injunction against speech—known as a prior restraint—must not be vague and must be narrowly tailored to prohibit only unlawful speech. Here, the district court issued a broad injunction banning appellant HonorSociety from posting truthful comments on Wikipedia, from freely reporting about a sexual-harassment allegation and an embezzlement arrest, and from publishing parody illustrations. The injunction is also unclear. Did the lower court err by issuing an overbroad and vague prior restraint?

**3. Unconstitutional Injunction Compelling Speech.** The government may not compel someone to speak its preferred message or force them to speak a certain viewpoint. Here, the district court ordered that if appellant HonorSociety speaks its own viewpoints about this lawsuit, it is required to publish a false "disclaimer" that the court wrote, and also publish its competitor PTK's contact information on HonorSociety's own website. Did the lower court err by issuing an injunction compelling speech?

## STATEMENT OF THE CASE

## PTK, HonorSociety, and This Lawsuit

Appellee Phi Theta Kappa Honor Society ("PTK") and Appellant HonorSociety.org Inc. ("HonorSociety") compete in the market for student memberships in community-college honor societies. ROA.8169. Founded in 1918, PTK has long been the dominant provider of academic and professional focused membership services to community-college students and has members at hundreds of community colleges in the United States. *Phi Theta Kappa Honor Soc'y v. HonorSociety.Org, Inc.*, No. 3:22-CV-208-CWR-RPM, 2024 U.S. Dist. LEXIS 57613, at \*3-4 (S.D. Miss. Mar. 29, 2024). Students who join PTK pay a one-time upfront fee to become lifetime members of its organization. ROA.9404.

Founded in 2014, HonorSociety seeks to provide scholarships to high achievers, create educational content, and preserve the distinguished history of honor societies. *Phi Theta Kappa Honor Soc'y*, No. 3:22-CV-208-CWR-RPM at \*4. HonorSociety has quickly become the second-largest competitor in the community-college honor-society market. ROA.2759.

PTK filed the underlying lawsuit against HonorSociety on April 20, 2022, alleging (i) trademark infringement, based on HonorSociety's use of the word "Edge" for one of its member benefits; (ii) trade-dress infringement, based on HonorSociety's use of blue-and-gold colors and gold graduation stoles, which several other honor societies use; and (iii)

3

false advertising and unfair competition, based on PTK's view that HonorSociety is not a legitimate honor society. ROA.52-74, 2707-52.

HonorSociety's founder and CEO, Michael Moradian, is not a party to this lawsuit. ROA.2707-52.

HonorSociety asserted counterclaims against PTK for (i) attempted monopolization, based on PTK's anticompetitive conduct directed at HonorSociety and others in the community-college honor society market; (ii) false advertising, based on PTK's false claims that it only invites the top 10% of community-college students into its organization and that its members receive exclusive access to $246 million in scholarships; (iii) defamation, based on PTK's false statements to community colleges that HonorSociety is a "scam" and not a legitimate honor society; (iv) cybersquatting, based on PTK's registration of several domain names containing HonorSociety's trademark; and (v) tortious interference, based on PTK's defamatory statements and urging of community colleges to block HonorSociety's communications to students. ROA.2758-2803. HonorSociety also asserted third-party claims against Dr. Lynn Tincher-Ladner, PTK's CEO, for false advertising and cybersquatting. ROA.2758-2803.

## PTK Disparaged HonorSociety

After filing its lawsuit, PTK published that HonorSociety "has deliberately confused students and diluted the value of membership by knowingly using a visual identity, marketing materials, regalia and

online content which are strikingly similar to those of [PTK]." *Phi Theta Kappa Honor Soc'y*, 2024 U.S. Dist. LEXIS 57613 at *8; ROA.1112-14. PTK also published that HonorSociety "has misled countless students into believing they were joining [PTK] when they were not." ROA.1112-14. PTK implied HonorSociety engaged in criminal conduct by encouraging "anyone who believes they have been misled by [HonorSociety] to contact their state attorney general's office or the Better Business Bureau." ROA.1112-14.

PTK released "student" journalism articles, quoting PTK representatives calling HonorSociety a "scam." ROA.6231-33. PTK also made public posts on Facebook starting with "SCAM ALERT!", stating "no such organization" named "Honor Society" exists, and alleging that HonorSociety's use of the generic blue-and-gold colors "play off the colors" of PTK "and other honor societies." ROA.6235.

**HonorSociety's Truthful Articles About PTK and This Lawsuit**

In June 2024—to counteract PTK's disinformation—HonorSociety published a series of articles on its website about PTK's false advertising, scandals within PTK, and this lawsuit. ROA.6210-11. Some articles discussed PTK's false statements in its invitations and advertisements that it only invites students in the "top 10%" of their colleges. *See*, *e.g.*, ROA.5697-98, 5717-18. In truth, based on grade-point-average data, PTK's invited students often fall only in the top 30% to 50% of their school. ROA.6203-06, 6289-6355.

Other HonorSociety articles addressed PTK's false statements that its members have "exclusive access to $246 million in scholarships" and that its "average member gets $2,500 a year" in transfer scholarships. *See, e.g.*, ROA.5679-80, 5685-86. But PTK's members do not have "exclusive" access to the $246 million in scholarships. Most scholarships are available to all students, regardless of whether they join PTK. *See* ROA.7774 (64.9% of transfer scholarships are available to all students, according to PTK data). And the scholarship amounts that PTK grants from its own funds ($1,059,935 in 2022) to its approximately 200,000 members averages out to $5.30 per member, not $2,500. ROA.7730, 7828.

HonorSociety also addressed PTK's claim that it is the "only official" honor society, and PTK's selling of member's personal information without their consent. *See, e.g.*, ROA.5685-86. PTK's "only official" honor society claim is misleading. It is based solely on a recognition in 1929 by an industry association and implies that all community colleges exclusively recognize PTK as legitimate to the exclusion of all others. ROA.7909-13. Further, HonorSociety's warnings about PTK selling member data without their consent is truthful. PTK sells the personal information of its PTK Connect and PTK Connect for Business members. ROA.6208-09, 6437. The terms and conditions for these programs do not disclose to members that their personal information will be sold to colleges and businesses. ROA.6392-98.

HonorSociety's articles also shed light on credible sexual-harassment allegations against PTK's previous executive director, Rod Risley. ROA.5916-19. Former PTK International Officer Toni Marek alleged that Risley repeatedly sexually harassed her at PTK events that she was required to attend as a student leader. ROA.7699-7707. The publication *Inside Higher Ed* interviewed Ms. Marek and another victim of Risley's harassment, Rachel Reeck, about their experiences. ROA.7704. Several media outlets have since told their stores, including the *Clarion Ledger* and the *Victoria Advocate*. ROA.7705.

The articles also described the arrest of a PTK chapter advisor, Robin Lowe, for embezzlement. ROA.5703-06. The articles detailed that Ms. Lowe "allegedly misappropriated funds intended for the honor society, using them for personal expenses." ROA.5703. According to the Mississippi Office of the State Auditor, Ms. Lowe was indeed arrested for embezzlement for allegedly "converting public funds meant to benefit the PTK chapter for her own personal use." ROA.6209, 6440. HonorSociety's article made clear that Ms. Lowe was "a former PTK advisor at Itawamba Community College in Mississippi," and nowhere claimed Ms. Lowe was a PTK employee. ROA.5703-06.

Several of HonorSociety's articles contained artificial-intelligence-generated cartoon caricatures of students under red stormy skies, with signs warning about PTK. *See, e.g.,* ROA.5637-61. Other caricatures included women who appeared to be older than college students, who

PTK contends were depictions of its CEO, Tincher-Ladner. ROA.5637,
5641. One cartoon depicted a woman wearing a crown and a robe
behind a counter with medals on display, which the court below
characterized as a depiction of "Dr. Tincher-Ladner as East Asian."
ROA.5968-70. The images were not labeled as depicting, and do not
depict, Tincher-Ladner. ROA.8361-62. Nor were they intended to convey
any racial image or message. ROA.8361-62.

Most of HonorSociety's articles discussed the claims in this lawsuit.
*See*, *e.g.*, ROA.5637-71. Some of these articles also opined on the
implications of the lawsuit for students and educational institutions.
*See, e.g.*, ROA.5685-88. HonorSociety also created a Twitter account
dedicated to informing the public about the lawsuit and posted about
the lawsuit from its own Twitter account. ROA.5897-5907.

## Wikipedia Edits

Wikipedia is a public marketplace of ideas allowing anyone to
contribute content and make edits to the content of others. ROA.8355.
Wikipedia states that "[a]ll articles must strive for verifiable accuracy
with citations based on reliable sources ...." ROA.8356. HonorSociety's
founder and executive director, Moradian, is an active editor on
Wikipedia. ROA.8354-55. When editing, he aims to bring articles into
compliance with Wikipedia's Five Pillars, which include viewpoint
neutrality and verifiability. ROA.8356. This demands that articles'
content be "determined by previously published information rather than

editors' beliefs, opinions, experiences, or previously unpublished ideas or information." ROA.8356.

As part of his editing of articles about honor societies, Moradian edited Wikipedia's page about PTK on several occasions to make it more objective and in line with Wikipedia's verifiability standards. ROA.8356. For example, in April 2024, Moradian added a detailed history of PTK with over 25 citations. ROA.8356. They included the well-documented claims of sexual harassment against Risley and the allegations of embezzlement against Robin Lowe. ROA.8356-57.

Moradian also edited the "Notable members" section of PTK's article. ROA.8357. Before his edits, this section had 23 "Notable members." ROA.8357. But only three of them had citations verifying their membership in PTK, and Moradian was unable to find any source verifying the PTK membership for the others. ROA.8357. In July 2024, Moradian deleted the 20 members whose membership was not verified. ROA.8357. He explained this edit by stating: "No citations or documentation to verify. Aiming to help create a neutral objective tone based on fact." ROA.8357. Moradian further edited the "Notable members" section by adding Thomas Matthew Crooks, who attempted to assassinate Donald Trump, citing a news article verifying his PTK membership. ROA.8357-58. Moradian added a "PTK Lawsuit" section, citing to a *Bloomberg Law* article, PR Newswire press release, and an article from PTK's own website about this lawsuit. ROA.8358.

On July 22, 2024, PTK representatives deleted from PTK's article (a) all mentions of Rod Risley, who led PTK for over 30 years, (b) the entire PTK Lawsuit section, (c) the entire Leadership Misconduct section, and (d) the Notable Members section. ROA.8358. Given that the information PTK deleted was well-cited within Wikipedia's guidelines, Moradian restored the information. ROA.8358. The next day, PTK again deleted this same information. ROA.8358-59.

Then another Wikipedia user unrelated to HonorSociety— Viewmont Viking—undid PTK's second deletion, citing PTK's "unexplained removal of well sourced information." ROA.8359. PTK continued to delete the information, and Viewmont Viking continued to undo the deletions, until Wikipedia banned the PTK representative's account. ROA.8359. PTK attempted to circumvent this ban by using another account to again delete this information and add back in the uncited "Notable members." ROA.8359-8360. But a Wikipedia administrator quickly banned PTK's second account from editing PTK's article due to "Block evasion." ROA.8360.

**PTK Moved for An Order Restraining HonorSociety's Speech**

On July 3, 2024, PTK moved under seal for a temporary restraining order, preliminary injunction and/or gag order. ROA.3684-87. PTK complained that HonorSociety's AI-generated articles with "horror-movie-like representations" attacked PTK, and contained statements close to those in survey questions that HonorSociety was previously

enjoined from sending. ROA.5581-84. PTK further argued that
HonorSociety's articles "disparaged" and "malign[ed]" PTK and Tincher-
Ladner. ROA.5583-84.

### PTK's Alleged Harm

PTK claimed that HonorSociety's articles about this lawsuit (a)
were misleading because they suggested HonorSociety "sued PTK, not
the other way around"; (b) "misrepresent[ed] the nature of the lawsuit
and overtly attack[ed] PTK's reputation"; and (c) attempted to stifle
PTK enrollment by, among other things, telling readers "[i]f you have
insights or information about PTK's deceptive practices, please email
PTKLawsuit@gmail.com." ROA.5584-86.

PTK claimed that HonorSociety's articles, created from June 18 to
24, caused "substantial" harm to it and Tincher-Ladner. ROA.5579,
5587-88. In support of this claim, PTK cited alleged harm that occurred
before HonorSociety's articles that PTK sought an injunction to prevent:
(a) PTK's decreased membership revenue of $80,000, and decreased
webstore revenue of $100,000, from March-June 2024, which was before
HonorSociety published its articles, compared to 2023; and (b) "dozens
of students [which] have contacted PTK to terminate their lifetime
memberships" since HonorSociety's "March survey," again before
HonorSociety ever published the articles. ROA.5587-88. It also alleged
damages occurring over an unspecified time: "15% of PTK's prior college

and corporate partners declining to renew their PTK Connect

memberships." ROA.5587-88.

### PTK Doesn't Know Whether HonorSociety Harmed It

On July 12 and July 17, 2024, the court held evidentiary hearings

on PTK's motion. Tincher-Ladner admitted that PTK had no evidence

that HonorSociety caused the alleged harm, and that PTK was only

"assuming" that PTK lost business because of HonorSociety's articles:

> Q; And as you sit here now, you can't think of a single person or company that has communicated to you that it was canceling a contract [or] not entering into a sale with PTK due to Honor Society's articles or other communications, correct?
>
> …
>
> A: I don't know why these people are pulling out. I'm assuming it's because of this, but I'm not going to sit here and tell you anything that I don't know. So they haven't told me why they have left. But they are leaving in droves, and they are leaving.

ROA.9423-24.

### The Court's Preliminary Injunction

On August 22, 2024, the court issued its Order on Second Motion

for Preliminary Injunction. ROA.8150. The Court found that PTK is

substantially likely to prevail on its tortious interference with

contractual relations claim. ROA.8166. The Court did not analyze any

other claim. ROA.8156, 8159-74.

The order granted PTK's motion in part, and requires HonorSociety to:

1.    Immediately cease edits to PTK's Wikipedia page, and subject itself to discovery on Wikipedia edits it may have made or caused during this litigation.

2.    Remove all images of the cartoon East Asian woman vendor from its webpages and social media posts.

3.    Remove all false subject matter from its webpages and social media posts regarding the Itawamba Community College chapter advisor's arrest.

4.    Limit its reporting on the sexual harassment allegations against Risley to existing media articles only, rather than articles of its own creation.

5.    Add the actual contact information for every PTK chapter into the "Directory," or delete the "Directory."

6.    Add the following disclaimer, in 12 point or larger size font, to the top of all remaining webpages and social media posts that concern or reference this litigation:

> Disclaimer: The author of this article is not a neutral party in the referenced litigation. HonorSociety.org Inc., Honor Society Foundation., and its president Michael Moradian were sued in federal court by PTK on April 20, 2022 for False Designation of Origin, Trade Dress Infringement, and Unfair Competition. Honor Society and Michael Moradian countersued and are presently defendants/counter-

> plaintiffs in this litigation. Litigation is still ongoing and all claims made regarding this case are just allegations against the parties.

The court gave HonorSociety the option of taking down prior content if adding this disclaimer to every page or post would be too burdensome. ROA.8174-75.

The court found that while HonorSociety has the right to "report or restate claims contained in the pleadings", this "does not … justify Honor Society's posts framing the facts in misleading or untruthful ways, or the editing of Wikipedia to cast PTK in a damming [sic] light…." ROA.8160-61. The court cited HonorSociety's "numerous false representations about PTK" as evidence of HonorSociety's "malicious intent to harm PTK's lawful business" and lack of justifiable cause for its conduct. ROA.8160.

The court characterized the cartoon image of the woman wearing a crown and a robe behind a counter with medals on display as depicting "Dr. Tincher-Ladner as East Asian," and described it as "the most offensive content in Honor Society's campaign." ROA.8163. The court further interpreted the cartoon woman as appearing "untrustworthy as she is selling fake medals or certificates", which plays into the "racist narrative of Asian-American women as untrustworthy." ROA.8164. The court claimed the cartoon "doesn't make sense as anything other than an appeal to racism" and "is despicable." ROA.8164.

As for PTK proving actual loss and damage resulting from HonorSociety's actions, the court balked at HonorSociety's argument that PTK "cannot identify a single actual or potential customer it lost." ROA.8165. The court found PTK's "list of students who have cancelled their memberships since Honor Society began sending surveys and posting online content disparaging PTK" as sufficient. ROA.8165. The only evidence the court cited supporting that HonorSociety caused these cancellations was a single student stating he cancelled because PTK "disclosed" their personal information. ROA.8165. The court said this statement "parrots HonorSociety's claims … that PTK is 'selling members' personal information without consent.'" ROA.8165. The court further stated that "[w]hile the causal connection for the lost profits can be more fully developed during discovery, 'a defendant who seeks to promote his own interest by telling a known falsehood to or about the plaintiff or his product may be said to have proximately caused the plaintiff's harm." ROA.8166.

The trial court's August 22, 2024 Order on Second Motion for Preliminary Injunction is the ruling presented for this Court's review. ROA.8150.

## SUMMARY OF THE ARGUMENT

The Court should reverse the district court's injunction for three main reasons.

**First**, the court below erred in its analysis of all four preliminary-injunction factors. It misapplied the law on likelihood of success and irreparable harm, and made clearly erroneous factual findings about the harm the injunction causes to HonorSociety and the public's interest.

The court found a substantial likelihood that PTK would prevail on its claim for tortious interference with contractual relations. To succeed on that claim, a plaintiff must identify specific contracts that were not performed due to the defendant's alleged wrongdoing. But here, the district court did not require PTK to clear that hurdle. Instead, it permitted PTK to rely on students walking away from lifetime memberships after they had already paid PTK, a generalized decline in PTK's revenue, and the decision of some PTK partners not to enter new contracts. Since none of these constitute breach of an existing contract, the court erred in concluding that PTK was likely to succeed on the merits of its claim.

The court further erred by finding that HonorSociety caused those losses based on mere correlation in time between HonorSociety's speech and PTK's alleged harm. As a matter of law, correlation is not causation and it was an abuse of discretion for the court to conclude otherwise.

Additionally, based on Supreme Court precedent, the federal courts of appeals for the Eighth, Ninth, Tenth, and D.C. Circuits have held that when the defendant's conduct concerns disparaging speech, a

plaintiff's tortious-interference claims are subject to the same First Amendment requirements that govern actions for defamation. This is to prevent plaintiffs from doing an end run around the First Amendment through creative pleading of a tort related to defamation without the same burden as defamation. This Court should join its sister circuits and hold that a tortious-interference plaintiff must plead and prove the elements of defamation when the conduct at issue is disparaging speech. And because the lower court did not find those elements, it erred as a matter of law.

On the remaining preliminary-injunction factors, the court found that because PTK suffered injury to its reputation, it established irreparable harm. But a plaintiff can only recover money damages for tortious interference with a contract. So, finding irreparable harm based on an alleged injury that does not qualify for recovery under the tort was an error of law.

Finally, in balancing the equities, the court failed to acknowledge that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. And on injury to the public, the court did not acknowledge that the public is served by having access to HonorSociety's speech about its competitor's business practices.

**Second**, the lower court's injunction violates the Constitution because it is an overbroad and vague prior restraint. The first part of

the order—prohibiting Wikipedia edits—is overbroad because it proscribes edits that are truthful. The prohibition isn't limited to preventing false or misleading comments.

The second part of the order—banning the cartoon image—is overbroad because it forbids publishing an image simply because the court found it "despicable." But the First Amendment protects offensive speech, and a court may not ban speech merely because it is offensive.

The third and fourth parts of the order—prohibiting discussion about the PTK advisor arrested for embezzlement and the former PTK CEO accused of sexual harassment—are overbroad. Those mandates prohibit truthful discussion about matters of public concern, namely a possible crime and credible allegations of misconduct. The order to "remove all false subject matter" about the chapter advisor is also unconstitutionally vague because the order did not identify any false subject matter and HonorSociety should not be forced to guess what material may be false.

The court also committed errors of law in analyzing the commercial-speech doctrine. It conducted a general analysis of all the speech at issue in aggregate, instead of analyzing each category of speech. And it also applied the wrong legal standard for enjoining commercial speech. Each error of law constitutes an abuse of discretion.

**Third**, the injunction violates the First Amendment because it compels speech. Generally, the government may not compel a person to

speak the government's preferred message, or require a party to include other ideas with its own message. But the fifth part of the order requires HonorSociety to publish a false disclaimer that the court wrote—expressing PTK's viewpoint and not HonorSociety's—or else HonorSociety is prohibited from speaking at all. And the sixth part of the order compels HonorSociety to promote its competitor's business by publishing PTK's contact information on HonorSociety's own website. Just as it did in issuing its prior restraints, the lower court failed to properly analyze the commercial-speech issues and applied an incorrect legal test to determine the propriety of compelling speech. Even if the speech is commercial, the court erred as a matter of law in compelling HonorSociety to speak the court's preferred messages.

Each of the three main issues involve errors of law reviewed de novo. This Court can reverse based on those errors without disturbing the trial court's factual findings. Some subissues involve the lower court making factual findings without evidence to support them. This Court may also reverse based on an abuse of discretion concerning those factual findings.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy" "warranted only when the movant shows '(1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted,

(3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest.'" *CAE Integrated, LLC v. Moov Techs., Inc.*, 44 F.4th 257, 261 (5th Cir. 2022) (per curiam).

The "standard of review for a district court's granting of a preliminary injunction is whether the issuance of the injunction, in the light of the applicable standard, constitutes an abuse of discretion." *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 284 (5th Cir. 1999) (per curiam) (citation and internal quotation marks omitted). "In performing that review, findings of fact that support the district court's decision are examined for clear error, whereas conclusions of law are reviewed de novo." Id. at 284-85 (citation omitted).

## ARGUMENT

**I. The district court misapplied the law on likelihood of success and irreparable harm, and made erroneous factual findings on the other preliminary-injunction elements.**

This district court erred in applying each of the four factors required for a preliminary injunction. It erred as a matter of law on the first two—whether the movant demonstrated a substantial likelihood of success on the merits, and irreparable harm. And on the balancing of hardships and public-interest elements, the record does not support the district court's findings.

**A. The district court committed legal error in finding a likelihood of success on the merits because it didn't find that a third party breached a contract, and mistook correlation for causation.**

The district court erred by finding a likelihood of success on the merits for two reasons. First, it did not identify any particular third party that failed to perform a contract with PTK, which is a required element. Second, the court found that HonorSociety caused PTK harm based solely on a correlation of time between HonorSociety's articles and PTK's alleged harm. But as a matter of law, correlation is not causation. This Court reviews a preliminary injunction for abuse of discretion, analyzing findings of fact for clear error and conclusions of law de novo. *Rest. Law Ctr.*, 66 F.4th at 597. Because the court concluded a likelihood of success based on improper application of law, the Court reviews this issue de novo.

**1. The district court erred because it did not identify any contract that a third party breached, a required element of the claim.**

For a tortious-interference-with-contract claim, the "plaintiff must prove that an enforceable obligation existed between the plaintiff and another party" and that "the contract would have been performed but for the alleged interference." *Par Indus. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998). The district court did not find a particular enforceable obligation or contract that was not performed. Rather, it found that PTK is likely to prevail based on evidence that: (1) at least

20 students had "left" their lifetime memberships, many of them after HonorSociety's posts, (2) 15% of PTK's college and corporate partners decided not to renew membership over an unspecified time, and (3) PTK lost $81,595 in membership revenue. ROA.8165-66. One student said they cancelled the lifetime membership because PTK disclosed their personal information. ROA.8165. The court noted that HonorSociety wrote about PTK's selling of personal information before the student canceled. ROA.8165-66.

But none of those findings indicate that anybody breached a contract with PTK. The "lifetime membership" only requires students to pay a one-time fee. ROA.9404. So, a student abandoning that membership after paying the fee would not represent a failure to perform an existing contract because the student was not contractually obligated to maintain the membership. Similarly, PTK's generalized lost revenue does not indicate a loss due to any specific breach of contract, which is what tortious interference with contractual relations requires. *See Cenac v. Murry*, 609 So. 2d 1257, 1269 (Miss. 1992). Likewise, a corporate partner's decision not to renew is not a breach of an existing contract. Rather, it is a decision not to enter into a new one. No evidence was before the court that any person failed to perform a contract with PTK.

District courts have noted that not only must a plaintiff ultimately prove a specific third party failed to perform a contract, but it must also

plead facts about that specific party in its complaint. *See, e.g.*, *Pie Dev., LLC v. Pie Ins. Hldgs., Inc.*, No. 3:19CV792-HTW-LGI, 2021 U.S. Dist. LEXIS 143323, at *28 (S.D. Miss. July 21, 2021) (dismissing complaint under Mississippi law that pleaded lost contracts generally but failed "utterly to identify any customer which it allegedly lost due to defendants' actions."); *RPM Pizza, LLC v. Risk & Ins. Consultans, Inc.*, No. 1:21-cv-158-LG-RHWR, 2021 U.S. Dist. LEXIS 215324, at *14 (S.D. Miss. Nov. 8, 2021) (dismissing complaint because, to properly plead tortious interference, Mississippi courts require the plaintiff to identify "the customers or business relationships which were lost."); *Ronaldo Designer Jewelry, Inc. v. Cox*, No. 1:17-CV-2-DMB-DAS, 2019 U.S. Dist. LEXIS 43785, at *11 (N.D. Miss. Mar. 18, 2019) (noting that where the plaintiff does not plead specific lost business because of the defendant's wrongful conduct, federal courts dismiss claims for tortious interference, and dismissing this one because the plaintiff "wholly failed to identify a specific relationship" that was harmed by the defendant's conduct); *Durham v. Ankura Consulting Grp., LLC*, No. 2:20-CV-112-KS-MTP, 2021 U.S. Dist. LEXIS 4639, at *20 (S.D. Miss. Jan. 11, 2021) (failing to identify lost customer insufficient for pleading purposes, but naming of specific client lost and including an affidavit from that client stating that the defendant's action caused the contract breach sufficient at the pleadings stage).

In other words, Mississippi law is clear that plaintiffs bringing claims for tortious interference with contract must prove the existence of an enforceable contract that would have been performed but for defendant's interference. *Hollywood Cemetery Ass'n v. Bd. of Mayor & Selectmen*, 760 So. 2d 715, 719 (Miss. 2000); *Par. Indus.*, 708 So. 2d at 48; *Cenac*, 609 So. 2d at 1268. So, it was an error of law for the district court to allow PTK to obtain an injunction based on evidence of generalized losses, refusals to enter new contracts, and students walking away from membership *after* fulfilling their contractual obligations to PTK. This Court should reverse and remand with instructions that the district court properly apply Mississippi law and require PTK to plead and prove a specific contract that a third party breached due to HonorSociety's conduct. The Court should also make clear that a showing of generalized harm or lost revenue is insufficient.

**2. The district court erred in finding that HonorSociety caused PTK's harm by mistaking correlation with causation, a legal error.**

The district court erred in finding that HonorSociety caused a breach of PTK's contracts. PTK provided the court with a list of students who canceled their lifetime memberships after HonorSociety began sending surveys and posting online content about PTK. ROA.8165, 9421. But PTK's only witness, Tincher-Ladner, testified that the customers who left PTK gave no reason for their departure. She

admitted she was just "assuming" that PTK lost business because of HonorSociety's articles. ROA.9423-24. A witness's assumption is not evidence of causation; it is mere speculation. ROA.9424. And "correlation is not causation." *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009).

Courts may not "allow evidence of temporal correlation to serve as a substitute for science-based causation evidence." *Id.* at 459; *see also Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (noting that "statistics can show only correlation and not causation"). This is because "[e]vidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence, because it does not adequately account for other contributory variables." *United States v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010). Many other variables apply here. For example, the single student the court identified as cancelling because of HonorSociety's statements might have instead canceled because she received email spam that she traced to her PTK membership. And there was no evidence that she had ever read HonorSociety's post that PTK shares students' information, only the court's assumption that she had done so given the correlation in time.

Similarly, PTK said "that 15% of its college and corporate partners have decided not to renew their PTK Connect memberships." ROA.8166. And it "attributes this to Honor Society's websites."

ROA.8166. But it's possible that PTK always experiences that attrition rate, or even a greater one. Countless variables could account for PTK's alleged losses. The court had no evidence that HonorSociety caused any of them.

The district court recognized the deficiency of evidence on causation, but discounted it, writing that "the causal connection for the lost profits can be more fully developed during discovery." ROA.8166. In doing so, the Court relied on *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014). *Lexmark* provides that a false-advertising defendant's false statements about a plaintiff or its product satisfy the proximate-cause requirement for pleading purposes. *Id.* at 132-134.

But the district court's reliance on *Lexmark* is misplaced for two reasons. First, it erred in applying *Lexmark* to a tortious-interference case because *Lexmark* is a Lanham Act false-advertising case. The Supreme Court noted that the "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action" and false advertising is different than tortious interference. *Id.* at 133.

Second, *Lexmark* involved a pleadings challenge. The Court concluded that the plaintiff had "*alleged* an adequate basis to proceed" and cautioned that "it cannot obtain relief without *evidence* of injury proximately caused by Lexmark's alleged misrepresentations." *Id.* at 140 (emphasis in original). In contrast, the cause of action in this case—

tortious interference—requires that the defendant cause a breach of a specific contract. And a preliminary injunction is not decided on allegations; the plaintiff must come forth with evidence. Here, no evidence shows that any party failed to perform any contractual obligation to PTK.

In sum, the lower court didn't find any evidence that HonorSociety induced the breach of a specific existing contract, which the law requires. *Cenac*, 609 So. 2d at 1268 (defendant must "cause another to breach a contract which he or she has with some third person"). And it impermissibly inferred causation from temporal correlation between HonorSociety's conduct and PTK's generalized damages. The court committed legal error on both points. Thus, PTK is not entitled to injunctive relief because it cannot establish the "most important factor" in the preliminary-injunction analysis: success on the merits. *See Mock v. Garland*, 75 F.4th 563, 586 n.60 (5th Cir. 2023). This Court should reverse.

### B. The district court erred in finding that PTK is likely to prove its tortious-interference claim without requiring it to meet "the same First Amendment requirements that govern actions for defamation."

The lower court's conclusion that PTK is likely to succeed on its tortious-interference claim presents a question of first impression for this Court: In a tortious-interference suit where the underlying conduct involves allegedly disparaging speech, does the First Amendment

require the plaintiff to satisfy the requirements of defamation? Several of this Court's sister circuits have so held, and the Supreme Court's teachings strongly support this conclusion. Because this is a purely legal issue, the Court reviews it de novo. *Rest. Law Ctr.*, 66 F.4th at 597.

In *Hustler Magazine v. Falwell*, Reverend Jerry Falwell sued *Hustler* and its publisher for running a fictitious "interview" where Falwell stated he had "a drunken incestuous rendezvous with his mother in an outhouse." 485 U.S. 46, 48 (1988). Reverend Falwell brought claims for libel, invasion of privacy, and intentional infliction of emotional distress. *Id.* at 48–49. Rev. Falwell won his claim for intentional infliction of emotional distress but did not prevail on the invasion of privacy and defamation claims. *Id.* at 48. On appeal, the Court overturned the jury's finding for Rev. Falwell because doing so was "necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment." *Id.* at 56-57. The Court held that, in addition to proving the elements of intentional infliction of emotional distress, Falwell was also required to meet the standard for defamation identified in *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 256 (1964). *See Hustler*, 485 U.S. at 56. Because Falwell failed to meet this standard, the Court set aside the jury verdict as unconstitutional. *Id.* at 57.

Several federal courts of appeals have since applied the Supreme Court's reasoning in *Hustler* to tortious interference claims arising from

a defendant's disparaging speech. For example, the Ninth Circuit held that tortious interference claims "are subject to the same First Amendment requirements that govern actions for defamation." *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990). The Eighth Circuit concurred, observing that this "is only logical, as a plaintiff may not avoid the protection afforded by the Constitution … merely by the use of creative pleading." *Beverly Hills Foodland v. United Food & Com. Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994). The Tenth Circuit followed suit in *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs.* 175 F.3d 848, 857 (10th Cir. 1999). And the D.C. Circuit ruled that a "plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013).

In opposing HonorSociety's motion to stay the injunction, PTK argued that the cases above involved "issues of public interest not present in this private dispute." (*See* Dkt. Entry 37-1 at 15, Appellee's Resp. Opp. Mot. Stay.) But this is a red herring because nothing in these opinions requires or suggests their holdings or reasoning cannot be applied to "private disputes." In fact, district courts have done exactly that. For example, in *Next Techs., Inc. v. Beyond the Office Door LLC*, plaintiff sued its competitor over two unflattering product reviews posted to the defendant's own website. No. 19-cv-217-wmc, 2020 U.S. Dist. LEXIS 102413, at *1-2 (W.D. Wis. June 10, 2020). Just as PTK

does here, the plaintiff alleged these articles amounted to tortious interference with contractual relations. *Id.* at *21-22. The *Next Technologies* court relied on the authorities cited above in dismissing the tortious-interference claim because plaintiffs could not clear the hurdles posed by defamation claims. *Id.* at *38-40.

And, contrary to PTK's argument, Honor Society's speech *does* touch on issues of public interest. Matters of "political, social, or other concern" to the community or subjects "of general interest and of value and concern to the public" are matters of public interest. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011). Here, HonorSociety's allegations of sexual harassment, embezzlement, and misleading students into paying money to join an organization involve social concerns and matters of general interest and value to the public. In fact, the newsworthiness of these issues is confirmed by the fact that bona fide news organizations covered several of these scandals. ROA.7704-05, 6440-41

In sum, the First Amendment requires that PTK plead and prove the elements of defamation as part of its tortious-interference claim. The district court did not offer any analysis of this issue despite HonorSociety directly raising it in opposition to PTK's preliminary-injunction motion. And this is not harmless error or something this Court can correct on review.

A defamation claim under Mississippi law must be tied to specific statements which are evaluated for falsifiability, the existence of

privilege, the level of fault required, and harm caused by the statement. *Franklin v. Thompson*, 722 So. 2d 688, 692-94 (Miss. 1998). Here, the district court did not conduct that analysis for any individual statement.

For example, the district court focuses on a "cartoon that depicts Dr. Tincher-Ladner as East Asian." ROA.8163. It claims that the image "leans into anti-Asian, specifically anti-East Asian, tropes" and that the cartoon "appears to be untrustworthy as she is selling fake medals or certificates." ROA.8164. The court concluded that "this behavior is without right or justifiable cause. It is despicable." ROA.8164. But the court never analyzed the very first element of a defamation claim: does the image constitute a falsifiable statement of fact? Let alone one that can be tied to Dr. Tincher-Ladner? Evaluating the image under a defamation lens would force the district court to actually consider— rather than summarily sweep aside—HonorSociety's explanation that the AI-generated image does not depict anyone in particular but instead serves as a metaphor for concerns over PTK's troubling business practices.

This Court should join its sister circuits and hold that plaintiffs who sue defendants over allegedly disparaging speech must plead and prove defamation regardless of how they label their claim. The Court should then remand this matter to the district court to analyze whether

PTK can meet each of the elements of defamation for any of the statements at issue.

## C.   The district court erred in applying the remaining preliminary-injunction factors.

The Court reviews a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law de novo. *Rest. Law Ctr.*, 66 F.4th at 597. A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed. *United States v. Abbott*, 110 F.4th 700, 708 (5th Cir. 2024). The district court did not properly apply the facts to the law in finding that there was a substantial threat of irreparable harm; that harm to PTK would outweigh the violation to Honor Society's constitutional rights; and that enjoining Honor Society's speech would not disserve the public interest.

The district court found that PTK's potential reputational damage satisfied the irreparable-harm requirement, and that: "the injury to PTK and Dr. Tincher-Ladner from Honor Society's cyberbullying outweighs any harm that an injunction would cause Honor Society." ROA.8168. But PTK's claim for tortious interference with contract only allows a plaintiff to recover money damages. *Cenac*, 609 So. 2d at 1271 (a defendant who tortiously interferes with a contract is responsible "for pecuniary loss"); *see also Par Indus. v. Target Container Co.*, 708 So. 2d

44, 50 (Miss. 1998) (plaintiff must show "the financial loss it suffered"). This is logical. When a defendant tortiously interferes with a contract, the harm to the plaintiff is the loss of the benefit of the bargain, not harm to plaintiff's reputation. That harm would be the profit the contracts would have generated. But those monetary losses are, by definition, quantifiable. So, they cannot provide the basis for a finding of irreparable harm required for a preliminary injunction to issue. *See Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (an injury is "irreparable" only if it cannot be undone through monetary remedies).

By contrast, the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347 (1976)). And given that the injunction will remain in place pending this appeal, HonorSociety faces far longer than a "minimal period" of loss here. So, even if the court was correct that PTK faced a substantial likelihood of irreparable harm, it erred by failing to properly balance it against the certain constitutional injury the injunction caused HonorSociety.

The district court attempted to sidestep this issue by claiming that an "appropriately-tailored injunction" would only mean that "HonorSociety would have to stop posting the false content the Court instructs it to." ROA.8168. And perhaps an appropriately tailored

injunction would have done so. But instead, the court issued a broad injunction that goes far beyond a prohibition on posting false content.

The injunction prohibits HonorSociety from contributing edits—whether truthful or not—to Wikipedia's entry on PTK. ROA.8175. The court gagged HonorSociety from reporting on sexual harassment allegations against PTK's former executive—again, without regard to whether the reporting is true or false. ROA.8175. And if Honor Society wants to discuss the lawsuit publicly, the court's order requires it to make the false statement that Moradian is a party to the lawsuit, when he is not. ROA.8175. The harm from this overreach outweighs any potential reputational harm to PTK.

Likewise, the district court was required to assess whether an injunction would serve the public interest. Once again it offered only a cursory analysis predicated on its claim that the injunction would only prohibit HonorSociety from making false statements about PTK. ROA.8169. But the injunction went much further than that, prohibiting even true statements. And it did so even though protecting First Amendment freedoms is "always in the public interest." *Opulent Life Church*, 697 F.3d 279, 298 (5th Cir. 2012) (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)); *see also Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). That's especially true here where HonorSociety seeks to disseminate information that a business competitor is engaged in a scheme designed

to extract money from college students while at the same time selling their personal information to marketers. As the district court itself recognized, the two sides in this lawsuit are competitors in a marketplace. ROA.8169. The public interest is best served by allowing both businesses to air their concerns in public so that consumers can better inform their own choices.

The district court's failure to properly balance PTK's interest in obtaining the injunction against the constitutional injury the injunction causes HonorSociety provides an independent basis for reversal. And the same goes for the disservice to the public interest in enjoining HonorSociety from making true statements about PTK.

Because the district court erred in finding PTK satisfied each of the preliminary-injunction factors—including errors of law on likelihood of success and irreparable harm—this Court should reverse the lower court and vacate the injunction.

## II. The injunction violates the Constitution because it is an overbroad and vague prior restraint.

The first four parts of the injunction constitute a prior restraint on HonorSociety's speech. *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013) (court orders aimed at preventing or forbidding speech "are classic examples of prior restraints"). Prior restraints "are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559

(1976). A prior restraint "by definition, has an immediate and irreversible sanction" and "the damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events." *Id.* For that reason, prior restraints face a well-established presumption against their constitutionality. *United States v. Brown*, 218 F.3d 415, 424-25 (5th Cir. 2000). A prior restraint on protected speech is "constitutional only if the government demonstrates that the protected speech restrained poses a 'clear and present danger, or a serious or imminent threat to a protected competing interest.'" *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 928 (5th Cir. 1996).

Here, the court below never analyzed whether HonorSociety's speech posed a clear and present danger, or a serious or imminent threat to a protected competing interest. *See id.*, 78 F.3d at 928. Nor did it determine that HonorSociety's articles implicate urgent national security or constitute a great and certain evil that cannot be militated by less intrusive measures. *See CBS v. Davis*, 510 U.S. 1315, 1317 (1994). Instead, the Court found that HonorSociety's speech was commercial and therefore accorded to "lesser protection" under the First Amendment. ROA.8170. It justified its injunction on the "substantial likelihood of reputational harm" and "substantial likelihood of prejudice to PTK by this commercial speech." ROA.8172.

A district court abuses its discretion when it applies the wrong legal standard or otherwise reaches erroneous conclusions of law. *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs. v. Kauffman*, 981 F.3d 347, 354 (5th Cir. 2020); *Basinkeeper v. United States Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). It also does so when it relies on clearly erroneous factual findings. *Basinkeeper*, 894 F.3d at 696. In fact, "in cases raising First Amendment issues … an appellate court has an obligation to make an independent examination of the whole record to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Marceaux*, 731 F.3d at 491-92 (cleaned up, citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)).

In analyzing the First Amendment issues in this case, the district court committed multiple errors of law and used clearly erroneous factual findings to support its conclusions.

### A. The court's ban on truthful edits to Wikipedia violates the First Amendment because it restrains noncommercial speech without justification, and is overbroad even if the speech is commercial.

The district court enjoined HonorSociety from making any edits to "PTK's Wikipedia page"—without regard to whether those edits are truthful or not. ROA.8175. In so doing, the court abused its discretion in multiple ways. First, it never analyzed whether edits to a Wikipedia page are commercial speech. ROA.8169-72. Second, it did not apply the

proper standard for determining the scope of its injunction and, as a result, failed to narrowly tailor it. ROA.8169-72. And third, it erred in concluding that: "When the edits are considered together, they suggest an intentional scheme to delete favorable content about PTK and introduce unfavorable content about PTK, rather than speak the truth." ROA.8159. Each of these failures constitute abuse of discretion and require reversal. *See Kauffman*, 981 F.3d at 354.

For half a century, the Supreme Court has consistently defined commercial speech as speech that "does no more than propose a commercial transaction." *Pittsburgh Press Co. v. Pittsburgh Com. on Human Relations*, 413 U.S. 376, 385 (1973). The high court has repeatedly reaffirmed this definition including unanimously in *Harris v. Quinn*, 573 U.S. 616, 648 (2014): "Our precedents define commercial speech as speech that does no more than propose a commercial transaction." (internal quotations omitted). And the "commercial speech doctrine rests heavily on the 'common-sense' distinction between speech proposing a commercial transaction . . . and other varieties of speech." *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 637 (1985) (internal quotations omitted, ellipses original).

Applying common sense, it is obvious that making edits to an open-source encyclopedia is not equivalent to speech that "does no more than propose a commercial transaction." In fact, none of the edits to the

Wikipedia page propose any commercial transactions whatsoever. ROA.8356-60, 8421-28, 8441-48, 8450-55, 8457-62, 8490-8513. Not directly. Not indirectly. Not expressly. Not impliedly. And the district court offered no analysis to the contrary. So, to the extent that the court concluded that the Wikipedia edits are commercial speech, that was an error of law requiring reversal.

Separately, the court clearly erred in concluding that the Wikipedia edits were an "intentional scheme to delete favorable content about PTK and introduce unfavorable content about PTK, rather than speak the truth." ROA.8159. The court's conclusion here rests on the addition of President Trump's would-be assassin to the list of PTK's notable alumni along with the deletion of other famous people, including an astronaut and governor. ROA.8159. The court asks, rhetorically, what the rational for the deletion could be. ROA.8159.

The simple explanation is that Wikipedia's standards require verifiability. ROA.8356, 8391. Wikipedia states that "articles must strive for verifiable accuracy with citations based on reliable sources …." ROA.8356, 8391. This demands that articles' content be "determined by previously published information rather than editors' beliefs, opinions, experiences, or previously unpublished ideas or information." ROA.8356, 8394. All the deleted names lacked citation to independent sources. ROA.8357, 8441-48. The legitimacy of the deletions is supported by the actions of other Wikipedia editors. When

PTK sought to undo the edits, these editors overruled PTK because of its "unexplained removal of well sourced information." ROA.8359, 8480. This ultimately led to Wikipedia banning PTK's account. And when PTK attempted to circumvent this ban by using Tincher-Ladner's account to again add back in the uncited 23 "Notable members," a Wikipedia administrator undid the edit and blocked her account as well. ROA.8359-60, 8515-29, 8531.

So, Wikipedia's neutral editors and administrators have resolved this issue: the edits offer well-sourced, factual information about PTK, not an "intentional scheme" to make PTK look bad. The district court clearly erred in concluding otherwise. Whether the edits were "favorable content" or "unfavorable content" about PTK, they were true statements on a public forum that were improperly enjoined.

Finally, the district court erred in determining the scope of its injunction. In the rare case when a prior restraint is justified, it must be narrowly tailored "to achieve the pin-pointed objective of the needs of the case." *Tory v. Cochran*, 544 U.S. 734, 738 (2005) (internal quotation marks omitted); *see also Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488 (5th Cir. 2013) (order requiring website take-down not narrowly tailored to address competing constitutional fair-trial concerns).

Here, the justification identified by the court was "the substantial likelihood of reputational harm [and] … prejudice to PTK by this

commercial speech." ROA.8172. But its injunction goes beyond enjoining commercial speech and even goes beyond enjoining false, misleading, or otherwise harmful edits to the Wikipedia page. Instead, it flatly prohibits all edits, even truthful ones about matters wholly unrelated to commercial transactions. Such a sweeping ban is an overbroad prior restraint, and this Court should reverse it and restore HonorSociety's free speech.

**B.    Outlawing the "despicable" image is unconstitutional because the First Amendment protects offensive images and parodies.**

The district court also enjoined publication of what it termed "the most offensive content in Honor Society's campaign," an AI-generated cartoon image. ROA.8163. Once again, the court offered no analysis of whether the image was commercial speech. To the contrary, the Court concluded: "It doesn't make sense as anything other than an appeal to racism." ROA.8164. And further opined: "It is despicable." ROA.8164.

But the First Amendment protects offensive, even despicable speech. *Matal v. Tam*, 582 U.S. 218, 244 (2017). In *Matal*, the lead singer of "The Slants" band sought registration of THE SLANTS as a trademark. *Id.* at 228. "Slants" is a derogatory term for Asian people. *Id.* at 223. The United States Patent and Trademark Office denied the application because federal law prohibited the registration of any trademarks that may "disparage any persons." *Id.* (citing 15 U.S.C.

§ 1052(a)). The Supreme Court found that restriction unconstitutional, noting that it had "said time and time again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Id.* at 244 (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)).

In this case, the injunction violates the First Amendment for the same reason as the Trademark Office's refusal to register THE SLANTS in *Matal*. The court found that the image of an East Asian woman is "despicable." ROA.8164. But "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Matal*, 582 U.S. at 244. Because the Supreme Court held that an outright Asian racial slur must be protected even if it is offensive, an image of a woman that some might interpret as perpetrating a racial stereotype is also protected.

Separately, the district court committed clear error in assuming that the image depicts Dr. Tincher-Ladner. The only evidence in the record is that the image was created by artificial intelligence. ROA.6211. It does not identify any particular person. And the articles and posts on which the image appears does not identify anyone either. ROA.5674-76, 5968-71, 5994-97, 6031, 6068.

Even if the image had identified Dr. Tincher-Ladner, it would still be protected because the First Amendment protects jokes and parodies, "whether clever or in poor taste." *Bailey v. Iles*, 87 F.4th 275, 283 (5th

42

Cir. 2023) (citation omitted); *see also Hustler*, 485 U.S. at 48 (protecting parody depicting Rev. Falwell as a drunkard partaking in an "incestuous rendezvous with his mother in an outhouse).

In short, the image is entitled to the full protection of the First Amendment and the district court abused its discretion in forbidding HonorSociety from publishing it.

### C. Censoring discussion about the PTK chapter-advisor arrest is vague as to what is "false" and overbroad because it applies to true statements.

Without identifying any particular false statements, the district court ordered Honor Society to "remove all false subject matter from its webpages and social media posts regarding the Itawamba Community College chapter advisor's arrest." ROA.8175. The content in question provides links to news articles about an incident where a PTK chapter adviser was arrested for embezzling funds intended for PTK. ROA.5703-06.

Injunctions are vague and violate due process unless "an ordinary person reading the court's order [can] ascertain from the document itself exactly what conduct is proscribed." *Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022). The order states that the article "makes Lowe appear as a PTK employee" when in fact she was an unpaid volunteer. Ex. A at 12. But the article referred to Lowe as an "advisor"—which she was—and never as an employee. Ex. G. Since the order requires

HonorSociety to self-determine what is "false," it is unconstitutionally vague.

As importantly, the court once again offers no analysis supporting the conclusion that this specific article is commercial speech. Instead, the speech is swept up in the court's general conclusion that all of HonorSociety's posts are commercial speech. ROA.8170-72. But making such a sweeping generalization is an error of law.

The Supreme Court and this Court require a searching inquiry, analyzing each portion of speech and not the sum of its parts. *See Bolger v. Youngs Drugs Prods. Corp.,* 463 U.S. 60, 66 (1983); *P&G v. Amway Corp.*, 242 F.3d 539, (5th Cir. 2001). In *Bolger*, the defendant mailed unsolicited advertisements for contraceptives. 463 U.S. at 61. They included three types of advertisements: flyers promoting a large variety of products, including the defendant's Trojan-Brand condoms, flyers exclusively or substantially devoted to promoting the defendant's products, and informational pamphlets describing the benefits of condoms generally and making specific mention of Trojan-brand prophylactics. *Id.* at 62, n.4. The Court analyzed the different types of speech separately. *Id.* at 66-68. In doing so, it found that the flyers— which consisted of price and quantity information—did no more than propose a commercial transaction and therefore fell comfortably within the core notion of commercial speech. *Id.* at 66, n.12. The informational pamphlets, however, presented a closer question. *Id.* at 66. The Court

ultimately concluded that the fact that the pamphlets were (1) "conceded to be advertisements," (2) referred to specific products, and (3) were prompted by the economic motivation of the speaker provided "strong support" for the conclusion that they were commercial speech. *Id.* at 66-67.

In applying *Bolger*, this Court has carefully evaluated different examples of speech independently. For example, in *P&G v. Amway Corp.*, this Court dealt with a case arising from the circulation of false rumors alleging a competitor was associated with Satanism. 242 F.3d 539 (5th Cir. 2001), *abrogated on other grounds by Lexmark Int'l, Inc.*, 572 U.S. 118. *Amway* centered around two categories of speech: (1) written fliers that specifically mentioned both manufacturers' products and urged consumers to choose Amway's, and (2) a voice memo from one Amway distributor that was forwarded to thousands of other distributors that also identified specific products. 242 F.3d at 542-43. This Court quickly recognized that the fliers qualified as commercial speech. They were traditional advertisements that identified specific products, urged consumers to buy alternatives from Amway, and were distributed by salespeople who had a clear economic interest. 242 F.3d at 552, n.25. In other words, they plainly "proposed a commercial transaction." *Id.*

By contrast, the voice memo presented a much closer call. *Id.* at 552. While the memo itself referred to specific Procter & Gamble

products, the Court held that whether the speech was an advertisement depended on the motivation of the speaker. *Id.* And the Court noted that even when the primary motivation for the speech is economic, that motivation does not make it commercial speech. *Id.* at 553. "We can well imagine cases in which a speaker's primary motivation is economic, but the speech nonetheless is protected." *Id.*

In contrast to the Supreme Court and this Court's emphasis on individualized assessments of the *Bolger* factors, the court below lumped all the disputed speech together. ROA.8170-72. This erroneous application of law resulted in several additional errors.

For example, in analyzing the second *Bolger* factor—whether the communication refers to a specific product or service—the lower court claimed that each of HonorSociety's posts "encourage[e] students to consider 'alternative societies that may offer more transparent and genuine benefits.'" ROA.8172. The court concluded that these statements "suggest students forego PTK and consider paying for Honor Society's services." ROA.8172. But the court's conclusion rests on an objective mistake. The language it quoted only appears in some articles, not all. For example, the article about the Phi Theta Kappa chapter advisor's embezzlement charge does not contain the language encouraging students to assess their options, or any similar call to action. ROA.5703-06. It was clear error for the court to conclude otherwise.

Since all three *Bolger* factors are required to support a finding of commercial speech, this error alone mandates reversal. And the court also erred in assuming, without analysis, that the article was an advertisement. In truth, the article is more akin to articles and blog posts that other courts have found to be protected speech.

For example, in *Tobinick v. Novella*, one doctor sued a second over the latter's self-publication of two blog posts. 848 F.3d 935 (11th Cir. 2017). The articles compared the doctor's medical services to those offered by "quack clinics" and noted the doctor had been investigated by the California Medical Board, which placed him on probation. 845 F.3d at 940. Both parties were doctors with some overlap in services, and the second doctor's articles explicitly mentioned and criticized the services offered by the first doctor.

Yet the Eleventh Circuit concluded that the articles were not commercial speech "as they do not propose a commercial transaction." *Id.* at 950. The court also noted that the articles evoked many characteristics of noncommercial speech because they communicated information, expressed an opinion, and recited grievances. *Id.* Similarly, the second doctor's articles did not discuss any products for sale by himself and only briefly mentioned his own practice. *Id.* at 951. Instead, the only reference to a product was the criticism of the first doctor's services and treatments. *Id.* The court observed that even if the second doctor received "some profit for his quasi-journalistic endeavors," the

articles themselves never proposed a commercial transaction, so it could not be commercial speech. *Id.* at 952. Given all this, the court had little difficulty concluding that the blog posts were noncommercial speech. *Id.*

The articles about the PTK chapter advisor's embezzlement charges are not commercial speech for similar reasons. They only reference PTK's services in the context of offering reporting and opinion on the scandal. They do not themselves propose a commercial transaction. And even assuming HonorSociety had an economic motivation in publishing the articles, that is insufficient to transform them into commercial speech. *Amway*, 242 F.3d at 553; *Tobinick* 848 F.3d at 952; *see also Wexler v. Dorsey & Whitney, LLP*, No. 18-CV-3066-SJB, 2019 U.S. Dist. LEXIS 186648, at *28 (E.D.N.Y. Oct. 25, 2019) (defendant law firm's blog post reporting on another lawyer's "major spousal scheme" to manufacture class-action claims was not commercial speech even though the firm's "motivation in having a blog, and publishing this particular article, may be to attract new clients").

The court also found it a "lie" that HonorSociety attributed Lowe's embezzlement to PTK's lack of leadership and internal controls. ROA.8161-62. The court reasoned that the embezzled funds were "taxpayer funds, not PTK membership dues." ROA.8161-62. But whether Lowe stole taxpayer money or membership dues is irrelevant to HonorSociety's opinion that PTK's poor oversight failed to prevent

one of its chapter advisors from embezzling funds. HonorSociety has the right to express its opinion.

The order to "remove all false subject matter from its webpages and social media posts regarding the Itawamba Community College chapter advisor's arrest" without identifying specific false statements or text to remove is overbroad, vague, and violates the First Amendment. This Court should overturn it.

### D. The ban on reports about sexual-harassment allegations against Risley is viewpoint discrimination, and overbroad because it forbids true statements.

The order prevents HonorSociety from making statements about sexual-harassment allegations against former PTK executive director Rod Risley, other than linking to "existing media articles only." ROA.8175.

The government may not regulate noncommercial speech based on its content or the message it conveys. *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995); *see R. A. V. v. St. Paul*, 505 U.S. 377, 391 (1992). By limiting HonorSociety's reporting on the Risley allegations to "existing media articles only, rather than articles of its own creation" the court is necessarily

preventing HonorSociety from expressing its own views on the allegations, which is textbook viewpoint discrimination. ROA.8175.

Here, again, the court failed to analyze whether HonorSociety's statements were commercial speech. And it is hard to see how making truthful statements about sexual-harassment allegations "does no more than propose a commercial transaction." *See Harris*, 573 U.S. at 648.

Separately, even if the lower court had properly found this article to be commercial speech, it still abused its discretion by failing to apply the correct test for whether and how to enjoin it. A prior restraint of commercial speech is governed by *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). *See also Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Prof'l Eng'rs & Surveyors*, 916 F.3d 483, 492 (5th Cir. 2019) (recognizing *Central Hudson* as controlling). But, here, the district court chose to evaluate the propriety of its prior restraint under *Marceaux*'s "substantial likelihood of prejudice test" rather than the *Central Hudson* framework. ROA.8172. This is yet another abuse of discretion requiring reversal. *See Kauffman*, 981 F.3d at 354 ("When a district court applies incorrect legal principles it abuses its discretion.")

Under *Central Hudson*, prior restraint of commercial speech that is not false or inherently misleading must "directly advance[] a substantial government interest" and must be narrowly tailored so as to not be "more extensive than is necessary to serve that interest." *Cent.*

*Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980); *see also Pub. Citizen, Inc. v. La. Atty. Disciplinary Bd.*, 632 F.3d 212, 218 (5th Cir. 2011) (quoting same). The court did not find that any of HonorSociety's articles detailing the sexual harassment allegations against Risley were false or misleading. So it had to identify a substantial government interest that would be served by preventing HonorSociety from continuing to report on the matter. Because the court failed to do so, its prior restraint is overbroad under *Central Hudson*, even assuming the articles constitute commercial speech, which they do not, as discussed above.

In sum, this Court should overturn the injunction preventing HonorSociety from truthfully reporting on or expressing its opinion about the Risley allegations. The injunction is overbroad and the lower court committed multiple errors of law in issuing it.

## III. The injunction compels speech, which violates the First Amendment.

Generally, "the government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). Nor may a court compel a person to speak a message the court thinks appropriate or require a party to include other ideas with its own message that it would prefer not to include. *See id.* (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 568–70, 576 (1995)). Even when the government may impose a disclosure in the

context of commercial speech, the disclosure must comply with "*Zauderer* scrutiny". This requires that the disclosure be: (1) purely factual, (2) uncontroversial, (3) justified by a legitimate state interest, and (4) not unduly burdensome. *See R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 877 (5th Cir. 2024) (summarizing *Zauderer*, 471 U.S. 626).

Here, the lower court abused its discretion by compelling HonorSociety to provide contact information for PTK chapters on HonorSociety's campus chapter directory. ROA.8175. It also forced HonorSociety to post a false disclaimer at the top of any discussion of this litigation. ROA.8175. This Court should overturn both provisions.

### A. The order unconstitutionally compels HonorSociety to publish PTK's contact information on HonorSociety's website.

The order requires HonorSociety to publish "actual contact information for every PTK chapter" or delete its Community College Honor Society Directory entirely. ROA.8175. Again, the court did not analyze whether the directory itself was commercial speech, nor did it apply *Zauderer* scrutiny or identify a substantial government interest served by the publication of PTK's contact information. ROA.8170-72. Each of these errors of law constitute abuse of discretion. *See Kauffman*, 981 F.3d at 354.

Instead, the court forced HonorSociety to choose between promoting PTK or refraining from speech about PTK's chapters. In

effect, the court targeted HonorSociety's views about PTK and forced it to add the district court's own message to counteract those views. This is classic viewpoint discrimination in violation of the First Amendment. *See Rosenberg*, 515 U.S. at 829 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."). And even assuming that the campus directories are commercial speech and that there is a substantial government interest justifying the compelled speech, it would still fail *Zauderer* scrutiny because forcing HonorSociety to publicize its competitor's business places an undue burden on HonorSociety.

**B. Requiring HonorSociety to publish a false "disclaimer" unconstitutionally compels HonorSociety to speak the court's untruthful message.**

Finally, the district court drafted a false "disclaimer" that it requires HonorSociety to include at the top of all its articles and before any social-media posts. The court's disclaimer is false because it provides that "Michael Moradian countersued" PTK, and that he and HonorSociety "are presently defendants/counter-plaintiffs in this litigation." But Moradian never sued PTK and is not a defendant or counter-plaintiff in this case. ROA.1-52. And even if it were true, the message would constitute viewpoint discrimination because it frames the lawsuit from PTK's point of view.

Requiring HonorSociety to publish the objectively false, PTK-slanted, disclaimer is government-compelled speech which "inherently regulates speech on the basis of its content." *R J Reynolds Tobacco Co.*, 96 F.4th at 875–76; *see also Hurley*, 515 U.S. at 573–74; *see also Riley v. Nat'l Fed. of Blind, Inc.*, 487 U.S. 781, 795 (1988).

As with the other parts of the order, the district court never analyzed whether or how HonorSociety's "webpages and social media posts that concern or reference this litigation" constitute commercial speech. Under strict scrutiny, which applies if speech is not commercial, a restriction is invalid "unless it is (1) justified by a compelling governmental interest and (2) is narrowly tailored to advance that interest." *Perez v. City of San Antonio*, 98 F.4th 586, 611 (5th Cir. 2024). "Narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest." *Id.* The order did not identify any compelling governmental interest, so it could not have been narrowly tailored to advance that interest. Nor did it consider any less restrictive means.

Even if the speech is commercial, the court was required to apply *Zauderer* scrutiny to determine the proper scope of any disclosure. It did not do so. ROA.8172. As drafted, the court's "disclaimer" fails all four of *Zauderer*'s requirements: It is false rather than factual. It is PTK-slanted rather than uncontroversial. It is untethered to any substantial government interest. And it is unduly burdensome on

HonorSociety because it requires HonorSociety to feature the court's PTK-slanted speech anytime it wishes to exercise its privilege to comment on this litigation.

The precedents of the Supreme Court and this Court do not support the imposition of the lower court's disclaimer. For example, in *National Institute of Family & Life Advocates v. Becerra*, California required certain clinics to notify women that they were not licensed to provide medical services. 585 U.S. 755, 760–61 (2018). The Court rejected this compelled speech on the grounds that California failed to show more than hypothetical harm because it provided no evidence that women did not know the covered facilities were staffed by unlicensed providers. *Id.* at 776–77.

By contrast, in *R J Reynolds*, Congress required cigarette manufacturers to warn about cigarette dangers on packages and advertisements. 96 F.4th at 867. The court found that increasing public understanding of smoking risks was a legitimate state interest. *Id.* at 883.

Here, the district court's compelled message is false and not justified by any legitimate state interest. No state interest exists in compelling a disclaimer that HonorSociety's suit is a counterclaim lawsuit rather than an original lawsuit, because that fact is immaterial. Indeed, courts regularly refer to claims filed by a counterclaim plaintiff

as a "counter lawsuit" or a "counterclaim lawsuit."[1] So it is accurate to say that a "counterclaim plaintiff filed a lawsuit against the counterclaim defendant" and specifically that HonorSociety filed a lawsuit against PTK. There's no material difference between claims brought by an original plaintiff and claims filed by a counterclaim plaintiff. They are subject to the same standards, procedure, and proof. Nor would any layman understand the hyper-technical difference—if one exists—between an original claim and a counterclaim. They are both lawsuits. Requiring HonorSociety to announce that PTK filed a lawsuit against it serves no purpose other than to impose PTK's viewpoint, while minimizing HonorSociety's. Nor is there a reason to force HonorSociety to announce that that the "author of this article is not a neutral party" when its articles all discuss its legal claims against PTK, so it's obviously not neutral.

---

[1] *See e.g.*, *Bandy v. DeLay (In re DeLay)*, No. 14-71512, 2018 Bankr. LEXIS 934, at *18 (C.D. Ill. Mar. 29, 2018) (referring to debtor's counterclaims, listed as an asset, as a "pending counterclaim lawsuit"); *Kargar v. Defendants*, No. 22-CV-664 (JMF), 2022 U.S. Dist. LEXIS 229863 at *3 (S.D.N.Y. Dec. 21, 2022) (denying inclusion in collective action notice a statement that "plaintiffs may be subject to discovery or a potential counter lawsuit"); *Carolina Cas. Ins. Co. v. Sharp*, No. 1:10CV02492, 2011 U.S. Dist. LEXIS 113184, at *14 (N.D. Ohio Sep. 30, 2011) (referring to counterclaims asserted in the underlying action as "Defendants' counter-lawsuit against ENC…"); *Am. Auto. Ins. Co. v. First Mercury Ins. Co.*, No. 13-439 KG/LF,2018 U.S. Dist. LEXIS 65980, at *9 (D.N.M. April 19, 2018) (referring to counterclaims in the same action as "the counter lawsuit.").

Separately, HonorSociety has an absolute right to comment on this case under Mississippi law. Mississippi courts consider statements made in connection with judicial proceedings, "if in any way relevant to the subject matter of the action," as "absolutely privileged and immune from attack as defamation, even if such statements are made maliciously and with knowledge of their falsehood." *Lehman v. Holleman*, 526 F. App'x 346, 348 (5th Cir. 2013). The district court acknowledged as much in its order. ROA.8161, n.7. But the court's injunction conditions the exercise of this right on the compelled publication of the court's own disclaimer. ROA.8175.

Whether analyzed under strict scrutiny, or under *Zauderer* scrutiny as commercial speech, the disclaimer is unconstitutional and this Court should overturn it.

## CONCLUSION

The district court erred as matter of law in finding that PTK satisfied each of the preliminary-injunction factors. It further erred as a matter of law in issuing an unconstitutional prior restraint, and compelling speech. This Court should reverse the order below and restore HonorSociety's constitutional rights.

And in doing so, the Court should hold that plaintiffs suing for tortious interference must plead and prove the elements of defamation when the underlying conduct involves allegedly disparaging speech. The

Court should also recognize that, under Mississippi law, a claim for tortious interference with contractual relations requires a plaintiff to plead and prove that the defendant caused a specific third party to breach a specific contractual obligation to the plaintiff, and identify the third party and obligation breached.

Dated:  November 4, 2024  Respectfully Submitted,

           NEWMAN LLP


           /s/ Derek A. Newman
           Derek A. Newman
           Derek Linke
           Jason B. Sykes
           100 Wilshire Blvd, Suite 700
           Santa Monica, CA 90401
           (310) 359-8200
           dn@newmanlaw.com
           linke@newmanlaw.com
           jason@newmanlaw.com

## CERTIFICATE OF SERVICE

On November 4, 2024, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ Derek A. Newman
Derek A. Newman
Derek Linke
Jason B. Sykes
100 Wilshire Blvd, Suite 700
Santa Monica, CA 90401
(310) 359-8200
dn@newmanlaw.com
linke@newmanlaw.com
jason@newmanlaw.com

**CERTIFICATE OF COMPLIANCE**

This document complies with: (1) the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12760 words, excluding the parts of the motion exempted by rule; and (2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

/s/ Derek A. Newman
Derek A. Newman
Derek Linke
Jason B. Sykes
100 Wilshire Blvd, Suite 700
Santa Monica, CA 90401
(310) 359-8200
dn@newmanlaw.com
linke@newmanlaw.com
jason@newmanlaw.com